## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

IRENE ARCHER,

       Plaintiff,

v.

JESSICA VIGIL-RICHARDS, JOHN DOE MENDOZA,
HOBERT SHARPTON, WEXFORD HEALTH SOURCES, INC., and the
NEW MEXICO CORRECTIONS DEPARTMENT

       Defendants.

### COMPLAINT FOR THE RECOVERY OF DAMAGES CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS

Plaintiff brings this complaint for damages caused by the violation of her civil and constitutional rights. Plaintiff files this complaint under the Federal Civil Rights Act, the Constitution of the United States, the Americans with Disabilities Act, the Rehabilitation Act and New Mexico tort law. In support of this complaint, Plaintiff alleges the following:

### JURISDICTION AND VENUE

1. Jurisdiction over the subject matter of this action is conferred by 28 U.S.C. §§ 1331 and 1367, 42 U.S.C. §§ 1983 and 1988, 42 U.S.C. §§ 12131 et seq., and 29 U.S.C. § 794(a).

2. Venue is proper as the acts complained of occurred exclusively within Cibola County, New Mexico.

### PARTIES

3. On the dates identified in this complaint, Ms. Archer was housed at the Western New Mexico Correctional Facility ("WNMCF"), a women's prison in Grants, New Mexico that is operated by the New Mexico Corrections Department ("NMCD").

4. Ms. Archer currently resides in Bernalillo County, New Mexico.

5. During material times Jessica Vigil-Richards was employed by NMCD as warden at WNMCF. Defendant Vigil-Richards is sued in her individual capacity.

6. During material times John Doe Mendoza was employed by NMCD at WNMCF; Mr. Mendoza's first name is unknown to Plaintiff at this time. He is sued in his individual capacity.

7. During material times Hobert Sharpton was employed by Wexford Health Sources, Inc., and served as medical director at WNMCF. Defendant Sharpton is sued in his individual capacity.

8. During material times Wexford Health Sources, Inc., provided medical care at WNMCF under contract with NMCD.

9. NMCD is the administrative arm of the State of New Mexico responsible for administering the state's correctional facilities, including WNMCF.

10. All individual defendants were acting under the color of state law and within the scope of their employment during material times.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

11. Irene Archer is 67 years old.

12. She is physically disabled.

13. She suffers from osteoarthritis (breakdown of the cartilage in joints), severe lumbar spondylosis (degeneration of vertebrae and disks in the lower back), spinal stenosis (abnormal narrowing of the spaces in the spine), degenerative scoliosis (general weakening of the spine), and multi-level cervical spondylotic myelopathy (compression of the spine) with segmental instability and severe myelomalacia (softening of the spinal cord).

14. She has also been diagnosed with diabetes.

15. In 2015, Irene underwent intensive surgery on her neck.

16. Following surgery, she was paralyzed and unable to move from her shoulders down.

17. Following surgery, Irene spent six months in a nursing home.

18. She had physical therapy while in the nursing home.

19. Physical therapists helped her regain some mobility in her arms and legs.

20. However, Irene never regained full physical mobility.

21. To this day, she has trouble bathing, dressing and walking.

22. She needs assistance with these and other major life activities.

23. She also suffers from incontinence.

24. Irene requires extensive medications every day.

25. Without pain medication, she suffers from extreme chronic pain in various parts of her body.

26. On June 4, 2020, Irene was sentenced to be incarcerated at the Valencia County Detention Center ("VCDC") in New Mexico.

27. Following her sentence, the warden at VCDC became aware of Irene's extensive physical disabilities.

28. In early November 2020, the warden at VCDC exchanged several communications with Defendant Vigil-Richards.

29. In these communications, the warden at VCDC and Defendant Vigil-Richards arranged for Irene to be detained as a "county hold" at WNMCF.

30. A county hold is an individual sentenced to be detained in a county jail who is reassigned to serve their term of incarceration at a state prison.

31. County holds can be assigned to serve terms of incarceration at a state prison for various reasons.

32. A common reason is because a county jail is incapable of providing the level of care the individual requires.

33. On November 4, 2020, after Defendants Vigil-Richards and the warden at VCDC made these arrangements, District Court Judge Cindy Mercer ordered Irene to be incarcerated at WNMCF instead of VCDC.

34. In her order, Judge Mercer specified that "[d]ue to the Defendant's existing medical conditions she requires specialized medical care."

35. Judge Mercer ordered that NMCD take responsibility for providing Irene's housing and specialized medical care.

36. Because of Judge Mercer's order, and because of her communication with the warden at VCDC, Defendant Vigil-Richards was well-aware that Irene was physically disabled and required specialized care.

37. On November 9, 2020, Irene arrived at WNMCF.

38. Anyone who saw her would have known that Irene needed a high level of medical care due to her disabilities.

39. Irene entered the prison using a walker.

40. On her way into the women's prison, she tripped over an exposed pipe, immediately injuring herself.

41. Her left knee was injured and caused her extreme pain.

42. Due to this injury, her left knee still hurts to this day.

43. Following her fall and the injury to her knee, Irene was placed in a wheelchair and rolled into the booking area.

44. During intake, NMCD staff and contractors confirmed that Irene required specialized medical care.

45. WNMCF has a long-term care unit ("LTCU") specifically designed to provide specialized medical care to people like Irene.

46. Instead of providing Irene with specialized medical care in the LTCU, Defendant Vigil-Richards placed Irene in a solitary confinement cell.

47. A solitary confinement cell is an inappropriate place to house anyone for an extended period of time.

48. A solitary confinement cell is an especially inappropriate place to house someone with Irene's specialized medical needs.

49. Irene was incarcerated for almost exactly one (1) year at WNMCF.

50. For most of that time, Irene was housed in a solitary confinement cell in WNMCF's "J Pod" housing unit.

51. Defendant Vigil-Richards saw Irene several times through the window of Irene's solitary confinement cell in J Pod.

52. On those occasions, Vigil-Richards could clearly see that Irene needed a walker or wheelchair to ambulate.

53. Defendant Vigil-Richards only conversed with Irene on one occasion through the window of her solitary confinement cell.

54. To talk to Defendant Vigil-Richards, Irene had to stand up and use her walker to ambulate to the window of her cell.

55. During their conversation, Irene told Defendant Vigil-Richards that she was being punished for being unable to provide a urine sample.

56. Irene couldn't provide a random urine sample because her hands lacked the strength and coordination to hold the container.

57. For this reason, she was disciplined by Defendant Vigil-Richards' staff.

58. When Irene explained to Defendant Vigil-Richards that she wasn't capable of collecting the urine sample without assistance, Defendant Vigil-Richards said she would look into the matter.

59. Upon information and belief, Defendant Vigil-Richards did nothing to investigate or resolve the issue regarding Irene being disciplined for being unable to provide a urine sample.

60. Irene was never able to speak to Defendant Vigil-Richards directly again.

61. Defendant Sharpton also knew Irene was housed in a solitary confinement cell at WNMCF.

62. Upon information and belief, Defendant Sharpton did not object to Irene being housed in a solitary confinement cell.

63. As was true of everyone else who saw or interacted with her, Defendant Sharpton was well-aware of Irene's intensive medical needs.

64. Irene told Defendant Sharpton her knee was injured because she had fallen when she was first booked into the women's prison.

65. Irene interacted with Defendant Sharpton many times during her incarceration at WNMCF.

66. Defendant Sharpton knew Irene was physically disabled.

67. Defendant Sharpton knew Irene required assistance to accomplish many major life activities.

68. Defendant Sharpton was well-aware that housing Irene in a solitary confinement cell made it impossible to provide her with the specialized medical care she required.

69. Defendant Sharpton failed to provide Irene with adequate pain management or other specialized medical care that she needed.

70. Defendant Sharpton took no steps to ensure Irene was housed in the LTCU or another minimally adequate unit until just a few weeks before Irene was released from WNMCF.

71. During approximately the first six months of her incarceration, Irene remained in 24-hour lockdown in solitary confinement.

72. During this period, Defendant Mendoza was the NMCD employee in charge of J Pod.

73. Throughout this period, Defendant Mendoza was extremely disrespectful and cruel toward Irene.

74. He consistently talked about her in the third person as if she didn't exist.

75. He regularly referred to her as "the old lady."

76. On several occasions, he looked in the window of her solitary confinement cell and would see her sitting on the toilet.

77. On those occasions, he often loudly announced that he couldn't see her because she was sitting on "the pot."

78. Defendant Mendoza often joked about Irene's pain and physical disabilities.

79. On one occasion, he had to push her in a wheelchair to the medical center.

80. On the way to the medical center, he told her to "just get up and walk."

81. Defendant Mendoza made this comment in a joking tone.

82. Understandably, comments like this humiliated Irene.

83. On that occasion, while he was pushing her in her wheelchair back from her appointment in the medical center, Defendant Mendoza announced to another corrections officer: "The old lady is mad at me."

84. Again, Defendant Mendoza used a joking tone.

85. The other corrections officer responded by saying: "I don't blame her one bit."

86. Although Defendant Mendoza knew Irene required intensive medical care, he refused to take simple and reasonable steps to ensure that this specialized care was provided to her.

87. Irene was unable to bear her own weight for any extended period of time.

88. Sometimes her left knee would just "give out."

89. Consequently, in addition to falling on her first day at the prison, Irene fell numerous other times while she was incarcerated at WNMCF.

90. When she fell, Irene sometimes sustained injuries.

91. On one occasion she fell backward and hit her head on a wall.

92. She felt dizzy afterward and began having headaches.

93. On at least one occasion, Irene fell twice within a single 24-hour period.

94. Defendant Mendoza knew that Irene fell frequently.

95. Defendant Mendoza failed to ensure that Irene was granted specialized care to protect her from falling or other injuries.

96. Defendants all knew that Irene needed intensive assistance with major life activities including using the bathroom and ambulation.

97. They all knew she had impaired mobility.

98. They all knew she suffered from acute pain.

99. They all knew Irene was at risk for falling.

100. Defendants Vigil-Richards, Mendoza and Sharpton all knew Irene did in fact fall frequently while she was housed at WNMCF.

101. Instead of providing her with specialized medical care, they allowed her to suffer in isolation and sustain numerous injuries while she was incarcerated at WNMCF.

102. Other aspects of Irene's conditions of confinement in J Pod were completely disgusting and inhumane.

103. For example, her incontinence caused her to urinate on herself.

104. Irene was sometimes forced to keep uniforms soaked in urine in her cell until laundry day.

105. On some occasions, she had to continue to wear clothes that were wet with urine because she ran out before laundry day.

106. On those occasions, she requested additional clothing but was not provided with it.

107. Furthermore, her toilet in her solitary confinement cell was covered with thick green mold inside the bowl.

108. The lights were also on 24 hours per day in her cell, even in the middle of the night.

109. Irene was fed baloney sandwiches every day, with baloney that was often spoiled and green in color.

110. There were occasions in which she found insects in the food that was served to her.

111. To make matters even worse, Irene was not allowed regular opportunities to interact with other people while she was incarcerated.

112. Defendant Mendoza, in particular, insisted that she be confined to her cell around the clock.

113. As a consequence, Irene suffered these indignities in almost complete isolation.

114. The main human contact Irene had in J Pod came by communicating with other women through vents in the cell walls.

115. When the other women in J Pod realized the depths of Irene's suffering and mistreatment, one of them began singing to Irene through the vents to provide her with some small measure of comfort.

116. Another inmate began reading the bible to Irene through the vents.

117. Irene had repeatedly asked NMCD staff for a bible.

118. This simple request was denied for months.

119. The inmate who read the bible to Irene eventually managed to get a copy of the bible to her so she could keep it with her in her cell.

120. Except for occasional showers, Irene was almost never allowed out of her cell during her incarceration at WNMCF.

121. On the rare occasions when she was allowed outdoors, she was confined to a cage with metal fencing by herself.

122. Such cages are often referred to as "dog runs."

123. It was on one of these occasions that Irene first met the woman who read the bible to her through the cell walls.

124. They saw each other from their separate dog runs through the metal fencing.

125. This was the first time they were able to greet each other face to face, even though they had communicated through the cell walls with each other for many weeks.

126. Irene's husband, Robert, died of cancer on September 12, 2021.

127. They had been married for 18 years.

128. Although he had been receiving radiation treatment for some time, his death still came as a shock to Irene.

129. Robert's death dramatically intensified the suffering Irene experienced at the hands of Defendants at WNMCF.

130. Through her case manager, Irene asked Defendant Vigil-Richards for permission to attend Robert's funeral.

131. The case manager told Irene that Defendant Vigil-Richards denied this simple, humane request.

132. Following Robert's death, Irene desperately needed behavioral health counseling.

133. Irene begged for counseling to help her cope with the trauma of losing her life partner and not being able to attend his funeral.

134. Irene received only one counseling session.

135. Upon information and belief, Defendant Vigil-Richards prohibited Irene from receiving additional counseling.

136. Toward the end of her term of incarceration, Irene's case manager noticed Irene was not receiving the minimally adequate medical care she required at WNMCF.

137. This case manager knew Irene couldn't accomplish many major life activities without assistance.

138. Upon information and belief, this case manager requested that Defendant Sharpton recommend a medical release for Irene.

139. Defendant Sharpton refused this request.

140. However, in October 2021, after a nurse named Torres insisted Irene needed adequate medical care, Defendant Sharpton finally placed Irene in WNMCF's LTCU.

141. Nurse Torres told Defendant Sharpton what he already knew: that Irene should have been placed in the LTCU from the beginning of her incarceration.

142. In the LTCU, Irene finally received some measure of the specialized medical care she required.

143. Irene was released from WNMCF on November 7, 2021.

144. Prior to the events described in this complaint, Irene had never been incarcerated.

145. The charges for which she was sentenced were nonviolent.

146. Since returning home to her family, in the words of her daughter, Irene has become "lost in this world."

147. She has become withdrawn.

148. In addition to her physical disabilities, she now suffers from post-traumatic stress disorder ("PTSD") and depression.

149. Irene spends as much time as possible confined in her room.

150. She struggles to socialize with people and members of her own family, including her grandchildren.

151. Upon first being released, she suffered from regular nightmares, often waking up screaming in the middle of the night.

152. In many of the nightmares a man was chasing her.

153. Sometimes this man chased her through large crowds of people.

154. Sometimes this man chased her when she was all alone.

155. These nightmares typically involved him catching Irene and struggling with her.

156. The man in her dreams usually began choking Irene to death by encircling his hands around her neck.

157. To Irene these nightmares seemed completely real.

158. Irene has required regular counseling and pharmaceutical interventions to attempt to reduce the nightmares, hallucinations, PTSD and depression caused by Defendants' acts and omissions.

159. Irene has been traumatized and damaged by the inexcusable and deliberate treatment Defendants subjected her to while she was incarcerated.

## VIOLATION OF EIGHTH AMENDMENT
## INHUMANE CONDITIONS OF CONFINEMENT and
## INADEQUATE MEDICAL CARE
**(Defendants Vigil-Richards, Mendoza and Sharpton)**

160. Plaintiff restates each of the preceding allegations as if fully stated herein.

161. Irene was incarcerated at WNMCF from November 2020 through November 2021.

162. During Irene's incarceration, Defendants Vigil-Richards, Mendoza and Sharpton all failed to provide her with the medical care, mental health counseling and other accommodations they knew she desperately needed.

163. As a consequence of Defendants' failure to provide her with even minimally adequate care and accommodations, Irene spent a year of intense pain, trauma, isolation, and humiliation at WNMCF.

164. While she was incarcerated at WNMCF, Irene had a right under the Eight Amendment to humane conditions of confinement and adequate medical care.

165. By failing to provide minimally adequate conditions and care, Defendants Vigil-Richards, Mendoza and Sharpton violated Irene's rights under the Eighth Amendment.

166. Because Defendant Vigil-Richards was the warden at WNMCF during material times, she was responsible for ensuring that Irene's constitutional rights were not violated while she was incarcerated.

167. Defendant Vigil-Richards had personal knowledge that Irene was being denied the medical and mental health care she required.

168. Defendant Vigil-Richards failed to take reasonable steps to ensure Irene was placed in constitutionally acceptable conditions and received the specialized medical care she required.

169. Because he supervised the unit in which Irene was housed, Defendant Mendoza likewise knew Irene was not receiving the medical care she required.

170. Defendant Mendoza saw Irene's suffering almost every day.

171. Instead of ensuring that she received adequate care, Defendant Mendoza joked about her physical disabilities in a manner that was humiliating and dehumanizing.

172. As medical director at the prison, Defendant Sharpton was directly responsible for ensuring that the women incarcerated at WNMCF received adequate medical care.

173. Defendant Sharpton saw Irene's suffering on numerous occasions throughout her term of incarceration at WNMCF.

174. He had the ability to ensure that Irene received the medical care she needed, and that she was required to receive under court order.

175. Defendant Sharpton failed to ensure that Irene received the specialized medical care she required.

176. During most of her incarceration at WNMCF, Defendants housed Irene in complete isolation.

177. Irene had very little direct human contact with anyone at WNMCF.

178. What minimal amount of human contact she had came from talking with other female inmates through the walls of her solitary confinement cell.

179. This isolation for months on end had a profoundly detrimental effect on Irene's mental health and well-being.

180. Instead of ensuring that Irene was transferred to the LTCU where she could receive adequate medical care, these Defendants allowed Irene to remain in dirty, disgusting and completely inadequate conditions in a solitary confinement cell.

181. The deliberate indifference of Defendants Vigil-Richards, Mendoza and Sharpton to Irene's need for specialized medical care violated her rights under the Eighth Amendment.

182. These individual Defendants knew Irene faced a substantial risk of serious harm by being placed in a solitary confinement cell for almost a year at WNMCF.

183. They were deliberately indifferent to that substantial risk of serious harm.

184. The complete disregard of Defendants Vigil-Richards, Mendoza and Sharpton to Irene's physical and mental safety equates to cruel and unusual punishment as prohibited by the Eighth Amendment to the United States Constitution.

### VIOLATION OF AMERICANS WITH DISABILITIES ACT
**(Defendant New Mexico Corrections Department)**

185. Plaintiff restates each of the preceding allegations as if fully stated herein.

186. While she was incarcerated at WNMCF, Irene suffered from multiple physical impairments that substantially limited several major life activities.

187. These major life activities included caring for herself, performing manual tasks, walking, standing, and lifting.

188. While she was incarcerated at WNMCF, Irene also had difficulty controlling her bladder due to these physical impairments.

189. Defendant NMCD, its employees, and its contractors all possessed records documenting Irene's numerous physical disabilities.

190. Furthermore, everyone who interacted with Irene while she was at WNMCF, including all of Defendant NMCD's employees and contractors, regarded Irene as being severely disabled.

191. Defendant NMCD's employees and contractors all knew Irene could have been provided with adequate specialized medical care and accommodations by housing her in WNMCF's LTCU.

192. Instead of housing her in LTCU, Irene was placed in long-term solitary confinement due to her disabilities.

193. Other county hold inmates at WNMCF were likewise placed in long-term solitary confinement because of their mental and physical disabilities.

194. Defendant NMCD's employees and contractors discriminated against Irene on the basis of her disabilities by denying her the full and equal enjoyment of services, programs and activities provided at WNMCF to incarcerated women without disabilities.

195. Irene was denied social interaction due to her physical disabilities.

196. Irene was unnecessarily placed in segregation due to her physical disabilities.

197. Irene was denied reasonable standards of hygiene due to her physical disabilities.

198. Irene was denied reasonable standards of medical care due to her physical disabilities.

199. Instead of making reasonable accommodations for Irene's disabilities, Defendant NMCD's employees and contractors discriminated against her on the basis of those disabilities.

200. As a public entity, Defendant NMCD is responsible for ensuring that its employees and contractors comply with the Americans with Disabilities Act.

201. The Americans with Disabilities Act protects qualified individuals with disabilities from discrimination.

202. The Americans with Disabilities Act likewise protects qualified individuals from being excluded from participation in or being denied the benefits of services, programs or activities of public entities like Defendant NMCD.

203. Irene is a qualified individual with disabilities as defined under the Americans with Disabilities Act.

204. Irene met the essential eligibility requirements for the receipt of services and the participation in programs or activities provided by Defendant NMCD.

205. Defendant NMCD's employees and contractors discriminated against Irene in violation of the Americans with Disabilities Act by placing her in long-term solitary confinement.

206. By failing to provide Irene with constitutional conditions of confinement, Defendant NMCD violated the Americans with Disabilities Act.

207. By failing to provide Irene with constitutionally adequate medical care, Defendant NMCD likewise violated the Americans with Disabilities Act.

208. As a proximate and foreseeable result of discriminatory acts and omissions by Defendants, Irene suffered injuries including pain and suffering, emotional distress, and exacerbation of her physical disabilities.

**VIOLATION OF REHABILITATION ACT**
**(Defendant New Mexico Corrections Department)**

209. Plaintiff restates each of the preceding allegations as if fully stated herein.

210. Defendant NMCD is a public entity that receives federal funding.

211. As alleged in this Complaint, Defendant NMCD's conduct, and the acts of admissions of its employees and contractors, violates Section 504 of the Rehabilitation Act.

## NEGLIGENT PROVISION OF MEDICAL CARE
### (Defendants Wexford Health and Sharpton)

212. Plaintiff restates each of the preceding allegations as if fully stated herein.

213. During material times, Defendant Wexford Health was contracted by NMCD to provide medical and mental health care to inmates housed at WNMCF.

214. During material times, Defendant Sharpton was employed by Defendant Wexford Health as medical director at WNMCF.

215. Defendants Wexford Health and Sharpton had a duty to provide all inmates at WNMCF, including Irene, with minimally adequate medical and mental health care.

216. During her term of incarceration at WNMCF, Irene suffered needlessly because Defendants Wexford Health and Sharpton refused to provide her with the medical and mental health care she clearly needed.

217. Because he was the medical director at WNMCF, and was intimately familiar with Irene's medical needs, Defendant Sharpton's actions and inactions were more than mere negligence, rising to the level of deliberate indifference.

218. Because he was deliberately indifferent to Irene's obvious medical needs, Defendant Sharpton was also negligent in failing to provide such care.

219. Defendants Wexford Health and Sharpton failed to act reasonably under the circumstances and failed to provide the medical and mental health care Irene desperately needed.

220. In doing so Defendants Wexford Health and Sharpton breached their duty to provide such care to Irene.

221. As a result of Defendants Wexford Health and Sharpton's negligence, Irene suffered injuries including pain and suffering, emotional distress, and exacerbation of her physical disability.

222. Defendant Wexford Health is responsible for Defendant Sharpton's negligence under a theory of respondeat superior.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all counts so triable.

WHEREFORE, Plaintiff requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including emotional harm.

2. Punitive damages in an as yet undetermined amount severally against Defendants Vigil-Richards, Mendoza and Sharpton.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

NEW MEXICO PRISON & JAIL PROJECT

*/s/ Steven Robert Allen*
Steven Robert Allen
Attorney for Plaintiffs
3800 Osuna Road NE, Ste 2
Albuquerque, NM 87109
(505) 515-0939