IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IRENE ARCHER,

    Plaintiff,

       vs.                    No. 1:23-CV-00655-KG-SCY

JESSICA VIGIL-RICHARDS,
DANIEL MENDOZA,
HOBERT SHARPTON,
WEXFORD HEALTH SOURCES, INC., and the
NEW MEXICO CORRECTIONS DEPARTMENT

    Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** is before the Court on a Motion for Summary Judgment, (**Doc. 78**), filed on January 24, 2025, by Jessica Vigil-Richards, Daniel Mendoza, and the New Mexico Corrections Department ("NMCD"). Ms. Archer filed a Response, (**Doc. 83**), on February 21, 2025, and Defendants their Reply, (**Doc. 88**), on March 17, 2025. Having considered the parties' briefing and applicable case law, the Court **GRANTS** Defendants' Motion for Summary Judgment. (**Doc. 78**).

## BACKGROUND[1]

On August 14, 2020, a district judge sentenced Ms. Archer to 364 days at the Valencia County Detention Center. (**Doc. 78-1**) **at 3**. In the "Judgment, Order of Commitment," the

---

[1] The Court takes the background facts from the parties' briefs and are supported by evidence in the record. The background facts are either undisputed, or, where genuinely disputed, are viewed in the light most favorable to Ms. Archer, the party opposing the grant of summary judgment. *See In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 964 (10th Cir. 2022). The facts included here are material and are not in dispute unless otherwise noted.

1

district judge specified the sentence would be "straight time," and Ms. Archer would not be eligible for "good time." *Id.*

On November 4, 2020, Ms. Archer transferred from the Valencia County Detention Center to the Department of Corrections Western New Mexico Correctional Facility ("WNMCF") for safekeeping due to her medical conditions, including osteoarthritis, lumbar spondylosis, spinal stenosis, scoliosis, and spondylotic myelopathy. *Id.* at 4; (Doc. 25) at 2, ¶ 13.

Defendant Jessica Vigil-Richards was the Warden at WNMCF From November 2020 to November 2021. *See generally* (Doc. 83-5). At that time, WNMCF had two divisions: the Reception and Diagnostic Division ("RDD") and General Population. (Doc. 78-3) at 1. The RDD included the Long-Term Care Unit ("LTCU"), while General Population consisted of Units 1–4. *Id.* Unit 4 was the Mental Health Therapeutic Community ("MHTC"), which included J-Pod. *Id.* The MHTC offered acute care for mental health needs, while the LTCU offered acute care for medical needs. *Id.* Chelsea White was the Unit Manager for J-Pod in 2020–2021, and her predecessor was Jason Baca. (Doc 78-2) at 1. Defendant Mendoza worked in J-Pod throughout November and December of 2020, as well as the first few days of January 2021. (Doc. 83-4) at 4. Defendant Mendoza also worked as an officer in Unit 3. (Doc. 78-3) at 1.

According to Ms. Archer, Defendant Mendoza insisted she be confined to her cell around the clock, referred to her as "the old lady," talked about her as if she did not exist, made comments about her sitting on the toilet, joked about her pain and disability, and told her to "just get up and walk" while pushing her in her in her wheelchair. (Doc. 83-8) at 2. Additionally, Defendant Mendoza told Ms. Archer she needed to move around for her arthritis. (Doc. 78-4) at 12.

Per policy, WNMCF kept county-hold inmates separate from other NMCD prisoners. **(Doc. 78-2) at 1**. This policy sought to ensure the safety and security of the county-hold inmates while they were held for safekeeping, and ensure they received appropriate care and treatment. *Id.* Consequently, jail officials housed county-hold inmates in J-Pod because it was a "hands-on unit." **(Doc. 78-3) at 3**. In the same unit as J-Pod, jail officials also housed inmates who presented a risk to the security of the facility and were on administrative segregation. **(Doc. 78-1) at 1**. An officer was always present in J-Pod. **(Doc. 78-3) at 3**. Nurses and doctors visited J-Pod daily, as did behavioral health staff. **(Doc. 78-7) at 1**. Jail administration conducted weekly rounds in J-Pod. **(Doc. 78-3) at 3**. Nurses also administered medication in J-Pod every day. **(Doc. 78-4) at 19**.

Ms. Archer was at WNMCF from November 9, 2020, to early November of 2021. **(Doc. 83-13) at 1**. When she arrived at WNMCF, jail officials placed her in the LTCU. **(Doc. 78-4) at 7**. On November 12, 2020, officials moved her from the LTCU to O-Pod. *Id.* By December 1, 2020, Ms. Archer transferred from O-Pod to J-Pod. *Id.* **at 9**. Mr. Archer remained in J-Pod for the majority of her incarceration. **(Doc. 78-2)**.

While in her cell, she slept a lot, spoke with other inmates at her cell door and through the vents, interacted with officers, and occasionally spoke with Karen—an inmate who cleaned the dayroom and the inmates' cells—and her caseworker. **(Doc. 78-4) at 3, 8, 9**. Ms. Archer also exercised her legs, read books, wrote letters, kept a diary, and worked on crossword puzzles in her cell. *Id.* **at 8, 11, 12**. Ms. Archer did not have a cellmate. *Id.* **at 5**.

In April of 2021, Unit Manager Chelsea White provided Ms. Archer with a television in her cell. *Id.* **at 2**. No other inmate in J-Pod had a television in their cell. *Id.* Ms. Archer had the television until she transferred to the LTCU on September 27, 2021. *Id.* at 19.

Starting on February 17, 2021, jail officials began providing Ms. Archer with tier time. *Id.* **at 15**. Ms. Archer sometimes used tier time to go to the gym, walk around a basketball court, or have church time. *Id.* **at 4**, **5**. Typically, however, she would go outside with another inmate and talk. *Id.* **at 4**. Ms. Archer also occasionally refused tier time. For example, on February 19, 2021, officers offered Ms. Archer gym time, and she refused. **(Doc. 88-1) at 12**. Only four inmates from J-Pod were allowed out at a time, and tier time was not provided daily. **(Doc. 78-4) at 5**. Lockdowns due to the Covid-19 pandemic or other reasons were frequent, and if tier time was not available, it was due to concerns over Covid-19, manpower or because Ms. Archer could not congregate with other inmates as a county-hold inmate. **(Doc. 78-2) at 2**.

With respect to hygiene, Ms. Archer typically showered at least once every four days during her time at WNMCF. ***See generally*** (**Doc. 88-1**). However, there were times when she went longer without showering, with the longest stretch being no more than two weeks. *Id.* **at 4**. Karen, another inmate, cleaned Ms. Archer's cell every two to three days. **(Doc. 78-4) at 13**.

Ms. Archer experienced incontinence while at WNMCF. **(Doc. 83-6) at 7**. When she urinated on herself, she cleaned her cell with paper towels and stored the soiled uniforms until laundry day. *Id.* She had three uniforms per week, and laundry was twice a week. *Id.* When Ms. Archer ran out of clean uniforms and had to wear urine-soaked clothing, she would ask officers for pads. *Id.* If available, officer would supply them; however, pads were typically distributed once a month and were not always in stock. *Id.* Other inmates also used pads. *Id.*

With respect to medical care, Ms. Archer saw doctors and nurses on multiple occasions, including at least one trip outside WNMCF to Cibola General Hospital for a mammogram. **(Doc. 88-1) at 1, 5, 6, 7, 10, 17, 22**. Doctors at WNMCF diagnosed Ms. Archer with diabetes and provided treatment. **(Doc. 78-5) at 3**. Ms. Archer also took several medications for her

medical conditions throughout her stay at WNMCF; Novolin for diabetes; Oxybutynin for incontinence; Duloxetine for depression; and Lasix for lower extremity edema. *Id.* **at 3–4**. To accommodate Ms. Archer's medical conditions, she was provided with a walker, wheelchair, and shower chair. (**Doc. 78-4**) **at 4**, **7**.

Ms. Archer also experienced falls throughout her time at WNMCF. One of the corrections officers stated that Ms. Archer fell "all the time." (**Doc. 83-9**) **at 7**. Ms. Archer stayed at WNMCF's LTCU on two different occasions due to her falling. The first time was in May 2021 for a few days. *Id.* The second time was on September 27, 2021, and Ms. Archer remained there until her discharge from WNMCF. *Id.* **at 19**; (**Doc. 78-5**) **at 2**.

Following her time at WNMCF, Ms. Archer filed claims against Defendants for violations of the Eighth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"). (**Doc. 25**). The instant motion seeks summary judgment in favor of Defendants on all these claims. (**Doc. 78**).

## RULE 56 SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1261 (10th Cir. 2022) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, but once the moving party has done so, the burden shifts to the non-movant to establish a genuine issue of fact." *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022). "The moving

party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citation omitted).  In opposing summary judgment, the non-movant cannot rest on mere allegations "but must bring forward specific facts showing a genuine issue for trial."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir.1996)).  "The summary judgment standard requires [the Court] to construe the facts in the light most favorable to the nonmovant and to draw all reasonable inferences in its favor."  *Beauford*, 35 F.4th at 1261 (citing *Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021)).  The Court's function at this stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson,* 477 U.S. at 249.  Further, the Court need not accept allegations contradicted by objective evidence.  *Beauford*, 35 F.4th at 1261 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## QUALIFIED IMMUNITY

Qualified immunity changes the summary judgment analysis.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

By asserting qualified immunity at the summary judgment stage, "the burden shifts to the plaintiff, who must demonstrate on the facts alleged that (1) the defendant's actions violated his or her constitutional or statutory rights, and (2) the right was clearly established at the time of the

alleged misconduct." *Beauford*, 35 F.4th at 1261 (citing *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)).  Defendants do not bear the "traditional burden of the movant for summary judgment" unless the plaintiff is able to satisfy this two-part test.  *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018) (quoting *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000)).

This is a "demanding standard."  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  The Tenth Circuit explained:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.  Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate.  The dispositive question is whether the violative nature of the *particular conduct* is clearly established.

*Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quotations and citations omitted).  Typically, a plaintiff may satisfy this demanding standard by "identifying an on-point Supreme Court or published Tenth Circuit decision that [establishes the unlawfulness of the defendant's conduct]."  *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quoting *Quinn v. Young*, 780, F.3d 998, 1005 (10th Cir. 2015)).  Alternatively, a plaintiff can also satisfy the clearly established standard by demonstrating "the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Id*.

## DISCUSSION

In the instant Motion, Defendants seek summary judgment on Ms. Archer's Eighth Amendment, ADA, and RA claims.  The Court addresses whether summary judgment is appropriate on these claims below.

**I.**     **Ms. Archer's Eighth Amendment Inhumane Conditions of Confinement Claim**

7

Under Count I, Ms. Archer alleges Defendants Vigil-Richards and Mendoza are liable under the Eighth Amendment for her conditions of confinement. (**Doc. 25**) **at 14–16**. Defendants seek summary judgment on this claim based on qualified immunity. (**Doc. 78**) **at 12–13**. To overcome Defendants' Motion, Ms. Archer must establish Defendants' conduct violated her Eighth Amendment right and that such right was clearly established at the time of the alleged conduct. *Beauford*, 35 F.4th at 1261.

**A. Did Defendants' conduct violate a constitutional right?**

An Eighth Amendment conditions-of-confinement claim includes an objective and subjective component. *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 809 (10th Cir. 1999) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991)).

The objective component requires the alleged deprivation to be "objectively, 'sufficiently serious.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson*, 501 U.S. at 298). Only deprivations of basic human needs, such as food, clothing, shelter, bedding, utilities, medical care, sanitation, exercise, and personal safety, satisfy this standard. *See Farmer*, 511 U.S. at 832; *Wilson*, 501 U.S. at 304; *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980). In contrast, "[m]ere discomfort or temporary adverse conditions which pose no risk to health and safety do not implicate the Eighth Amendment." *Whitington v. Ortiz*, 307 Fed. Appx. 179, 187 (10th Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, courts consider the severity and duration of the deprivation to determine if it is sufficiently serious. *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998)).

In her Response, Ms. Archer argues the extreme isolated conditions she experienced in J-Pod were profoundly dangerous to her physical well-being and mental health, and thus satisfy

8

the objective component. (**Doc. 83**) **at 20**. While Ms. Archer generally references "extreme isolated conditions," she does not identify specific conditions. The Court therefore interprets her claim as alleging two specific deprivations: the denial of out-of-cell exercise and the denial of human contact. *Id.* **at 20**; (**Doc. 25**) **at 11, 15, ¶¶ 120, 177**.[2]

Viewed in the light most favorable to Ms. Archer, the evidence indicates she did not have out-of-cell exercise for over three months after arriving at WNMCF. Ms. Archer, in her diary, recorded the first offer of tier time on February 16, 2021. (**Doc. 88-1**) **at 4–12**. A three-month denial of out-of-cell exercise given Ms. Archer's medical conditions satisfies the objective component. *See Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994) (holding that plaintiff pled plausible Eighth Amendment conditions-of-confinement claim by alleging he received only thirty minutes of out-of-cell exercise in three months).

Although a three-moth denial of out-of-cell exercise satisfies the objective component, Ms. Archer's claim based on lack of human contact and social interaction does not. The undisputed evidence shows that, although officials limited her in-person interactions, Ms. Archer regularly spoke with corrections officers, communicated with other inmates through vents and at

---

[2] The Court clarifies that Ms. Archer's other allegations, such as lack of showers, deprivation of a Bible, wearing soiled clothes, or enduring cruel comments, do no satisfy the Eighth Amendment's objective component. These conditions either do not involve the deprivation of a basic human need or were temporary and posed no risk to health or safety. *See McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y. 2003) ("[A] two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs.'"); *McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) (explaining that taunts and threats do not constitute Eighth Amendment violation); *Tapp v. Proto,* 718 F.Supp.2d 598, 619 (E.D.Pa. 2010) (holding that inmate forced to wear dirty, torn, and stained undergarments during confinement did not establish constitutional violation).

9

her cell door, made phone calls to her family, sent and received letters, and met with medical and behavioral health staff. This level of human contact and social interaction does not amount to a "objectively, sufficiently serious" deprivation. *See Silverstein v. Fed. Bureau of Prisons*, 559 Fed. Appx. 739, 756 (10th Cir. 2014) (holding that restrictions on social contact were not sufficiently serious to implicate Eighth Amendment where inmate could communicate with other inmates by yelling cell to cell, had limited daily interaction with prison staff, and received two fifteen-minute phone calls and five social visits per month).

Next, under the subjective component, there must be sufficient evidence in the record for a rational factfinder to conclude Defendants acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. In Eighth Amendment conditions-of-confinement cases, the standard is deliberate indifference to a substantial risk of serious harm to an inmate. *Id.* at 836.

To determine if an official acted with deliberate indifference to a substantial risk of serious harm to an inmate, a plaintiff must show the official: (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, (2) actually drew that inference, and (3) was aware of and failed to take reasonable steps to alleviate that risk. *Perry v. Durborow*, 892 F.3d 1116, 1122 (10th Cir. 2018) (quoting *Keith v. Koerner*, 843 F.3d 833, 848 (10th Cir. 2016)). Significantly, "it is not enough to establish that the official should have known of the risk of harm." *Barney*, 143 F.3d at 1310 (citing *Farmer*, 511 U.S. at 837).

While there is some evidence Defendant Mendoza was aware of a substantial risk of harm to Ms. Archer posed by a lack of out-of-cell exercise and disregarded it, there is no comparable evidence regarding Defendant Vigil-Richards.

According to Ms. Archer's affidavit, Defendant Mendoza insisted she be confined to her cell around the clock and joked about her pain and disability. (**Doc. 83-8**) **at 2**. Additionally,

Ms. Archer, in her deposition, testified that Defendant Mendoza advised her to move around for her arthritis. (**Doc. 78-4**) **at 12**. Viewed in a light most favorable to Ms. Archer, this evidence supports a reasonable inference that Defendant Mendoza: (1) knew facts indicating a substantial risk of serious harm, (2) actually recognized that risk, and (3) failed to take reasonable steps to address it. This evidence supports such an inference because it shows Defendant Mendoza knew Ms. Archer suffered from arthritis, understood movement was beneficial, and knew she was not receiving any out-of-cell exercise.

On the other hand, there is no evidence Defendant Vigil-Richards was aware of facts from which a reasonable inference could be drawn that Ms. Archer faced a substantial risk of serious harm. Specifically, there is no direct or circumstantial evidence that Defendant Vigil-Richards knew Ms. Archer was denied out-of-cell exercise during her first three months at WNMCF, or that such a deprivation posed mental or physical health risk. Ms. Archer did not show she filed a grievance, lodged a formal complaint, or otherwise informed Defendant Vigil-Richards about the lack of out-of-cell exercise. And while it is difficult to imagine a scenario where a Warden would not know about such a prolonged denial of out-of-cell exercise, deliberate indifference requires *actual knowledge*.

While Ms. Archer can satisfy both components of the Eighth Amendment analysis as to Defendant Mendoza, she concedes in her Response that any denial of tier time/recreation during her incarceration was due to Covid-19, manpower, or because she could not congregate with other inmates as a county-hold inmate. *Compare* (**Doc. 78**) **at 8**, **¶¶ 72, 74**, *with* (**Doc. 83**) **at 11–12**, **¶¶ 72, 74**. All these reasons for denial of tier time and recreation implicate prisoner health and safety (*i.e.*, they are penological interests).

The Tenth Circuit has recognized out-of-cell exercise may be denied for legitimate penological interests. *See Perkins*, 165 F.3d at 810 n.8 (10th Cir. 1999) (agreeing with prior authority that "penological considerations may, in certain circumstances, justify restrictions" on out-of-cell exercise). Because Ms. Archer concedes any denials of out-of-cell exercise were based on these interests, she cannot establish an Eighth Amendment violation. Defendants are therefore entitled to qualified immunity on this claim.

**B. Did Defendants violate a clearly established constitutional right?**

Even assuming Ms. Archer could prove Defendants violated her Eighth Amendment rights, she does not show any such right was clearly established. Ms. Archer does not cite any precedent addressing a denial of human contact or social interaction under the Eighth Amendment. Thus, the Court limits its analysis to whether a three-month denial of out-of-cell exercise under the specific circumstances of this case clearly violated the Eighth Amendment. To find that a right was clearly established, a plaintiff must show that "a reasonable . . .[official] in the defendant's shoes would understand that what he or she did violated that right." *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007).[3]

The most on-point and factually similar case Ms. Archer cites is the Tenth Circuit's decision in *Housley*. 41 F.3d 597. There, the Tenth Circuit held that an inmate who alleged he received only thirty minutes of out-of-cell exercise over three months plausibly alleged an Eighth Amendment violation. *Id.* at 599. In its opinion, the Tenth Circuit recognized a "total or near-

---

[3] The cases Ms. Archer cites address far more extreme conditions of confinement, such as inmates in cells covered in feces, denied outdoor recreation for three years, denied food and water, or exposed to raw sewage. *See e.g., Fogle v. Pierson*, 435 F.3d 1252, 1260 (10th Cir. 2006); *Taylor v. Riojas*, 592 U.S. 7 (2020). THus, these cases do not support a clearly established right to out-of-cell exercise under the specific circumstances of this case.

total deprivation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees." *Id.* While the inmate's allegations were sufficient at the pleading stage, the court emphasized, "no precise standards have been set forth delineating what constitutes constitutionally sufficient opportunities for exercise," and "what constitutes adequate exercise will depend on the circumstances of each case, including the physical characteristics of the cell and jail and the average length of stay of the inmates." *Id.*

Although the *Housley* case is similar to the present case, it does not clearly establish that a three-month denial of out-of-cell exercise violates the Eighth Amendment under the specific circumstances of this case. A reasonable prison official relying on the *Housley* case would understand that such a denial of out-of-cell exercise *could* violate the Eighth Amendment, but whether it does depends on the specific facts of each case, including the physical characteristics of the cell and jail, and the average length of stay of the inmates. Here, Ms. Archer was incarcerated for a year and housed in a single cell with space to exercise. Given these circumstances, a reasonable official relying on the *Housley* case could believe a three-month denial of out-of-cell exercise did not clearly violate the Eighth Amendment.

Moreover, *Housley* did not address extraordinary circumstances, like a global pandemic and its effect on the right of out-of-cell exercise. It did, however, recognize that penological interests may justify such restrictions, making it reasonable for jail officials to believe restricting out-of-cell exercise to prevent the spread of Covid-19 and manage staffing shortages did not clearly violate the Eighth Amendment.

In short, reasonable officials in Defendants' shoes, relying on *Housley*, would not have known beyond debate that denying Ms. Archer out-of-cell exercise for three months under the specific circumstances of this case violates the Eighth Amendment—especially, given *Housley's*

13

acknowledgment that no bright-line rule governs what constitutes adequate exercise. *See Cox v. Zmuda*, 2023 WL 7279337, at *7 (D. Kan.) (finding that denying inmate out-of-cell exercise for eight months because of staffing shortages resulting from Covid-19 did not violate a clearly established right).

**II.      Ms. Archer's Eighth Amendment Inadequate Medical Care Claim:**

Under Count I, Ms. Archer also alleges Defendants "failed to provide her with the medical care, mental health counseling and other accommodations they knew she desperately needed." **(Doc. 25) at 14, ¶ 162**. She further claims Defendants did not ensure she was transferred to LTCU where she could receive adequate medical care. **(Doc. 25) at 16**, **¶ 180**. As with Ms. Archer's conditions-of-confinement claim, Defendants argue they are entitled to qualified immunity on this claim.

An Eighth Amendment inadequate medical care claim requires "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference is present if prison officials intentionally deny or delay access to medical care or intentionally interfere with treatment once prescribed. *Id.* at 104–05.

The undisputed evidence shows Ms. Archer received medical care without any interference from Defendants. While at WNMCF, Ms. Archer was provided with a walker, wheelchair, and shower chair; visited the LTCU multiple times; and had regular access to nurses, doctors, and behavioral health staff. **(Doc. 78-4) at 4, 7, 8, 17**; **(Doc. 78-7) at 1**. She received treatment and medications for her existing conditions and was diagnosed with new conditions, such as diabetes, for which she was prescribed medication. **(Doc. 78-5) at 3–4**; **(Doc. 88-1) at 6**. As courts have recognized, "[w]here there is such evidence of a 'series of sick calls, examinations, diagnoses, and medication … it cannot be said there was a deliberate indifference

to the prisoners' complaints.'" *Buchanan v. Elliott*, 2021 WL 1206405, at *7 (E.D. Okla.) (quoting *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976)).

With respect to Ms. Archer's claim that Defendants did not ensure her transfer to the LTCU, Doctor Sharpton made this decision, not Defendants Vigil-Richards or Mendoza. Accordingly, Ms. Archer cannot state a claim against them on this basis. (**Doc. 78-6**) **at 4; (Doc. 83-5) at 4**. To establish an Eighth Amendment violation, Ms. Archer must show Defendants' personal involvement in the alleged violation. *See Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir. 1976) (emphasizing that personal participation is essential to 42 U.S.C. § 1983 claim); *Beauford*, 35 F.4th at 1265 ("Prison officials generally may rely on the advice and course of treatment prescribed by medical personnel.").[4]

For these reasons, Ms. Archer cannot establish an Eighth Amendment inadequate medical care claim against Defendants. Consequently, Defendants are entitled to qualified immunity on this claim.

### III.  Ms. Archer's ADA & Rehabilitation Act Claims:

Under Count II, Ms. Archer alleges Defendant NMCD is liable under the ADA because she was denied social interaction, placed in segregation, denied reasonable standards of hygiene, and denied reasonable standards of medical care due to her physical disabilities. (**Doc. 25**) **at 195–98**.

Title II of the ADA provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

---

[4] *See also Gee v. Pacheco*, 2008 WL 11394280, at *1 (D. Wyo.) ("Corrections officials retain broad discretion over the administration of prisons, including housing in general and Plaintiff does not have a constitutional right to a particular cell assignment, nor to be housed in general population.")

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This provision extends to discrimination against state inmates. *See Penn. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210 (1998). To state an ADA claim, a plaintiff must allege that "(1) [s]he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Cohon ex rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011) (citation omitted).

Defendant NMCD does not dispute Ms. Archer's status as a qualified individual with a disability under the ADA. (**Doc. 78**) **at 15**. Rather, Defendant NMCD takes issue with the last two elements – that Ms. Archer was excluded from participation or denied the benefits of its services, programs, or activities by reason of a disability. *Id.* The Court agrees.

In her Amended Complaint, Ms. Archer alleges NMCD denied her reasonable standards of hygiene and medical care because of her disability. However, in her Response, she challenges the adequacy of the hygiene and medical care provided to her by NMCD *in light of* her disability, not that such care was denied because of her disability. For example, Ms. Archer asserts she did not have sufficient access to laundry given she suffered from incontinence, (**Doc. 83**) **at 6**, **¶ 31**, and she should have been placed in the LTCU because she fell all the time. *Id.* **at 9**, **¶ 51**. But "the ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo Cnty.*, 609 F. 3d 1011, 1022 (9th Cir. 2010). Thus, Ms. Archer cannot establish an ADA violation on these grounds.

Ms. Archer likewise cannot establish an ADA violation based on her claims that her social isolation and placement in segregation were because of her disability. The undisputed evidence shows her placement in J-Pod resulted from her status as a county-hold inmate not her

disability. (**Doc. 83-1**) **at 2**; (**Doc. 83-12**) **at 2**. NMCD policy requires county-hold inmates to be housed separate from other NMCD inmates. (**Doc. 78-2**) **at 1**; (**Doc. 78-3**) **at 1**.

To the extent Ms. Archer asserts a failure-to-accommodate claim, it similarly fails. The ADA requires only reasonable accommodations that provide meaningful access to the facility's programs, services, and activities. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Jail officials provided Ms. Archer with a walker, wheelchair, and shower chair while at WNMCF – accommodations addressing her mobility needs. While Ms. Archer may have preferred placement in the LTCU, the ADA does not entitle qualified individuals to the accommodations of their choosing. *Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1177 (10th Cir. 1999). There is no evidence the accommodations provided to Ms. Archer were inadequate at providing her access to NMCD's programs, services, and activities.

Moreover, Ms. Archer's allegation that Defendant Vigil-Richards failed to hire an ADA coordinator does not establish an ADA claim. To prevail, Ms. Archer must establish she was excluded from participation in, or denied the benefit of programs, services, or activities by reason of her disability. As already discussed, she failed to do so, and the absence of an ADA coordinator does not change that outcome.

For all these reasons, Ms. Archer cannot show an ADA violation by Defendant NMCD. Because the RA applies the same standard as the ADA, Ms. Archer's RA claim also fails. *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1312 (10th Cir. 2021).

## **CONCLUSION**

In sum, Defendants are entitled to qualified immunity on Ms. Archer's Eighth Amendment claims and summary judgment on Ms. Archer's ADA and Rehabilitation Act claims. The Court therefore **GRANTS** Defendants' Motion for Summary Judgment (**Doc. 78**).

Ms. Archer's claims against Defendants Jessica Vigil-Richards, Daniel Mendoza, and NMCD are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

/s/
KENNETH J. GONZALES[5]
CHIEF UNITED STATES DISTRICT JUDGE

---

[5] Please note that this document has been electronically filed. To verify its authenticity, please refer to the Digital File Stamp on the NEF (Notice of Electronic Filing) accompanying this document. Electronically filed documents can be found on the court's PACER public access system.